# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MARC D. BIRNBACH,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 3:19-cv-1328 (VLB)** |
| | : | |
| **AMERICARES FOUNDATION INC.,** | : | **June 29, 2020** |
| **Defendant.** | : | |

## <u>RULING ON DEFENDANT'S MOTION TO DISMISS, [ECF NO. 13]</u>

Before the Court is a Motion to Dismiss the Plaintiff Marc D. Birnbach's Complaint, [ECF No. 1], pursuant to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6), brought by Defendant Americares Foundation Inc. ("Americares" or "Defendant").  [ECF No. 13].

Specifically, Americares moves to dismiss Counts One and Two of Plaintiff's Complaint, sounding in discrimination and hostile work environment under the Connecticut Fair Employment Practices Act ("CFEPA"), respectively, under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction based upon Plaintiff's failure to exhaust his administrative remedies with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). [ECF No. 14 at 5-8].

Americares further moves to dismiss Counts Three (alleged discrimination under the Americans with Disabilities Act ("ADA")), Four (alleged hostile work environment under the ADA), Five (state law claim sounding in intentional infliction of emotional distress), Six (state law claim sounding in negligent infliction of emotional distress), and Seven (state law claim sounding in breach of

the covenant of good faith and fair dealing) under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief can be granted.  [ECF No. 14 at 8-21].

For the reasons set forth herein the Americares' Motion to Dismiss will be GRANTED-IN-PART.

## I.  STANDARD OF REVIEW

### A.    Fed. R. Civ. P. 12(b)(1)

"Federal courts are courts of limited jurisdiction . . . ."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013).  Subject matter jurisdiction is not waivable, and a lack of subject matter jurisdiction may be raised at any time, by a party or the court *sua sponte*.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) ("Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy.").  In circumstances where a plaintiff lacks Article III standing, a court may not exercise subject matter jurisdiction.  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).  If a court lacks subject matter jurisdiction, it must dismiss the action.  *See* Fed. R. Civ. P. 12(h)(3).

A "district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239,

2

243 (2d Cir. 2014).  However, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings . . . ."  *Id.*  "In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Id.*

     B.    <u>Fed. R. Civ. P. 12(b)(6)</u>

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## II. ALLEGATIONS

In reviewing a motion to dismiss, the Court considers the allegations of the complaint to be true. *Hayden*, 594 F.3d at 161.

"Plaintiff has a learning disability, which was diagnosed when he was a child." [ECF No. 1 (Complaint) ¶ 9]. "It is a combination of dyslexia, slow lag, auditory processing disorder, and attention deficit disorder and attention deficit hyperactivity disorder ('ADD/ADHD')." *Id*. "His disability limits the pace at which he processes information, including taking in information correctly, making

sense of it and responding." *Id*. "As a result, his processing deficit usually is aided by taking copious notes." *Id*.

Plaintiff's "particular deficit usually results in significant communication issues with others and generally leads to misunderstandings and/or miscommunications." *Id*. ¶ 10. "Plaintiff's difficulty in processing information usually results in his taking a stance on a particular issue and then not budging from that position." *Id*. "More often than not, some portion of information may be missing but, nevertheless, his mind draws a logical connection and/or conclusion and does not budge from it." *Id*. "His disability also affects his spelling and grammar." *Id*.

Plaintiff disclosed his deficits to Jed Selkowitz, Americares' Senior Vice President and Chief Marketing Officer, during his interview, telling him that "he processed information slowly and that he tended to be aggressive on a creative level as he tended to fight for and was very protective of his creative ideas and beliefs. Plaintiff also told Mr. Selkowitz that he had an auditory processing issue combined with ADD/ADHD." *Id*. ¶¶ 11, 14.

"in his role as [Americares'] Multimedia Manager, Plaintiff was assigned one individual to supervise, Jake Rauscher." *Id*. ¶ 20. "At some point, the staff began bypassing Plaintiff and going directly to Mr. Rauscher to do projects." *Id*. "Plaintiff had discussions with different staff members and ultimately with Mr. Selkowitz and requested that the practice of going directly to Mr. Rauscher cease

as it hindered Plaintiff's ability to properly train and develop Mr. Rauscher's skills and it undermined Plaintiff's supervision of him." *Id.* "The practice, nonetheless, persisted." *Id.*

"In or about May 2017, a meeting was held in [Americares'] Stamford office, . . . attended by Mr. Rauscher, Mr. Selkowitz and Plaintiff." *Id.* ¶ 21. "At the meeting, Mr. Selkowitz . . . referred to Plaintiff as a '[p]ussy.'" *Id.* "Plaintiff felt humiliated and belittled, especially as it was in the presence of Mr. Rauscher, Plaintiff's direct report at that time." *Id.*

"After the incident in which Mr. Selkowitz referred to Plaintiff as a '[p]ussy' and as word of Plaintiff's learning disability became more known in the office, he began to notice a trend in the office." *Id.* ¶ 23. "Where Plaintiff usually attended company meetings, project meetings and other functions, Plaintiff began to be excluded from those events." *Id.* "Plaintiff's input and his involvement were not sought with respect to meetings, decisions and planning in his department or as it related to his subordinates." *Id.* "Mr. Selkowitz would reassign jobs and duties that were Plaintiff's responsibility to his subordinate." *Id.*

"At some point, Mr. Selkowitz generated a flow chart of staff members and their areas of responsibility." *Id.* ¶ 24. "From the flow chart it was clear to see that Plaintiff's responsibilities as Multimedia Manager had been reduced and that Plaintiff was being isolated in his employment duties and office environment." *Id.* "It was also clear to see that Plaintiff had been reassigned, that Mr. Rauscher was

6

reassigned to another manager and that Plaintiff had no link to anyone other than Mr. Selkowitz on the flow chart." *Id.*

"In about June 2018, [Americares] rolled out a flexible work program and Plaintiff realized working remotely was possible under this new plan." *Id.* ¶ 26. "Plaintiff . . . sought permission to work remotely." *Id.*

"By letter dated June 27, 2018 from [Americares], Plaintiff's relocation request was granted." *Id.* ¶ 28.  That letter specifically approved Plaintiff working from home as part of [Americares'] flexible work plan." *Id.*  "In reliance upon the approval, Plaintiff sold his home in New York, purchased a home in Wisconsin and committed to a mortgage for a new home." *Id.* ¶ 29.  "On July 1, 2018, Plaintiff moved to Milwaukee, Wisconsin with his fiancé." *Id.*

As part of his annual review, Americares accepted written input from both Plaintiff and Mr. Selkowitz.  *Id.* ¶ 30.  In Plaintiff's section, in response to a question concerning what his manager could do to help him achieve his goals, Plaintiff wrote, in part, "I recognize that I am sensitive and also slow to process information clearly and need some extra time and care to understand a complete thought," *id.* ¶ 31, and Mr. Selkowitz commented, "Marc's unique perspective and approach to projects was a key reason I was excited he was joining our team.  We do not see it as a negative and I think the team has done well to embrace a nonlinear content creator who has outside the box ideas.  <u>I think the team has</u>

done their best to adapt to Marc's learning style and information processing." *Id.*
¶ 32 (emphasis in Complaint).

On an Americares trip to Puerto Rico around this time with Kathy Kukula,
Americares' Associate Director of Content Development, Ms. Kukula went to
great lengths to assist Plaintiff with his work assignments when he got
overwhelmed with "an ever-increasing list of projects, most of which had
imminent deadlines." *Id.* ¶ 34. "Ms. Kukula was aware of Plaintiff's learning
disability . . . [and t]o her credit, she helped Plaintiff tremendously and was able
to guide him and assist him to fulfill his tasks." *Id.* ¶ 36. "What Ms. Kukula did in
Puerto Rico to help Plaintiff triggered memories of how he was guided
throughout his education pathway and his learning disability by resource
programs and teachers." *Id.*

On August 21, 2018, Plaintiff attended his annual performance review with
Mr. Selkowitz and another Americares executive. *Id.* ¶ 38. "Plaintiff was in
[Americares'] Stamford office from September 7, 2018 to September 14, 2018." *Id.*
¶ 39. "During that trip, Mr. Selkowitz did not have a discussion with Plaintiff
about his job performance while Plaintiff was in the office." *Id.*

"[T]wo days later, Plaintiff received a document entitled 'Performance
Improvement Plan' from Mr. Selkowitz which stated: 'PIP Period: September 17,
2018 – December 17, 2018.'" *Id.* ¶ 40. "In the PIP, Mr. Selkowitz, for the first time,
raised the issue of the inconvenience to the organization of Plaintiff working

remotely from home." *Id.* ¶ 41. "Mr. Selkowitz stated that [Americares] 'was not given an opportunity to properly evaluate' whether based on the nature of Plaintiff's and the organization's needs, remote work was appropriate." *Id.* "Mr. Selkowitz was aware of Plaintiff's relocation request and never took the opportunity to raise any issues with Plaintiff about working remotely in Wisconsin." *Id.*

"On September 28, 2018, Plaintiff responded to an email that he received from Mr. Selkowitz the day before." *Id.* ¶ 44. "The Selkowitz email essentially described flaws in Plaintiff's performance and in his communication skills, flaws which Plaintiff believed were directly linked to his disability." *Id.*

Following an event with UPS in which Plaintiff was dissatisfied with UPS' ability to deliver a drone to him on location for Americares, Plaintiff posted negative information about UPS on social media. *Id.* ¶ 51. Unbeknownst to Plaintiff, UPS was a "donor and partner" of Americares. *Id.* ¶ 53. "Plaintiff received an email dated November 7, 2018 from Diana Maguire, Associate Director at [Americares], in which she blamed him for the 'mess' with UPS and made specific reference to Plaintiff's social media post which she believed impugned UPS' reputation." *Id.* ¶ 54. "She concluded, 'The whole exchange was embarrassing and damaging to our relationship with UPS who is a donor and partner.'" *Id.* "Plaintiff also received an email from Mr. Selkowitz, dated November 8, 2018, . . . about the incident." *Id.* ¶ 56. "In the email, Mr. Selkowitz

9

essentially concurred with Ms. Maguire's assessment of the conflict and stated that 'it's not acceptable to speak to a partner as you did . . . or to shame a partner for not (in your opinion) more effectively resolving a personal matter.'" *Id.*

"On November 9, 2018, . . . Plaintiff received an email from [Americares executive] Mr. Gilrain with the subject line, 'Termination of Employment Letter.'" *Id.* ¶ 57.   "The email included an attached written notification of Plaintiff's termination of employment (the 'Termination Letter') with Defendant." *Id.* "The termination had been conveyed to Plaintiff earlier that morning via a telephone conversation with Mr. Gilrain." *Id.* "The Termination Letter [wa]s dated November 9, 2018 and made Plaintiff's last day of work November 9, 2018." *Id.*

### III.  DISCUSSION

As an initial matter, Plaintiff concedes in opposition to Americares' Motion to Dismiss that Counts Six and Seven, alleging state law claims of negligent infliction of emotional distress and violation of the covenant of good faith and fair dealing, respectively, may be dismissed.  [ECF No. 28 at 1 ("Plaintiff agrees that Counts Six and Seven, alleging state law claims of negligent infliction of emotional distress and violation of the covenant of good faith and fair dealing, may be dismissed.")].  Accordingly, the Court dismisses Counts Six and Seven of Plaintiff's Complaint with Prejudice.

A.      **Counts One and Two (CFEPA Discrimination and Hostile Work Environment)**

Americares moves to dismiss Counts One and Two of Plaintiff's Complaint, sounding in discrimination and hostile work environment under the Connecticut Fair Employment Practices Act ("CFEPA"), respectively, under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction based upon Plaintiff's failure to exhaust his administrative remedies with the Connecticut Commission on Human Rights and Opportunities ("CHRO").  [ECF No. 14 at 5-8].

Americares argues that pursuant to the CFEPA and under well-settled, binding precedent in both Connecticut state courts and, in this District, "an employee 'can only bring a civil action against the [employer] if [he] requests and obtains a release from the [CHRO].'"  *Id.* at 5-7 (quoting *Angelsca Prods., Inc. v. Comm'n on Human Rights & Opportunities*, 248 Conn. 392, 405 (1999) and citing *Anderson v. Derby Bd. of Educ.*, 718 F. Supp. 2d 258, 272 (D. Conn. 2010), and other cases).  Americares cites a case, *id.* at 7 (citing *Winter v. Conn.*, No. 3:14-cv-01139 (VLB), 2016 U.S. Dist. LEXIS 132114, at *9-10 (D. Conn. Sept. 27, 2016)), where "this very Court dismissed plaintiffs' CFEPA claims for failure to exhaust administrative remedies."  *Id.*  Americares notes that even though the Equal Employment Opportunity Commission ("EEOC") and the CHRO have a work-sharing agreement "under which a CHRO release of jurisdiction letter suffices to satisfy the federal exhaustion requirement, the terms of that agreement are not reciprocal and do not provide that an EEOC right to sue letter satisfies the CFEPA

exhaustion requirement."  *Id.* (citing *Edwards v. William Raveis Real Estate, Inc.*, No. 08-cv-1907 (JCH), 2009 U.S. Dist. LEXIS 42400, at *3 (D. Conn. May 19, 2009)). Thus, Americares argues, the fact that Plaintiff obtained a release from the EEOC has no bearing on his claims under the CFEPA, which mandates that they be dismissed.  *Id.* at 7-8 ("Absent an allegation . . . of the release of jurisdiction over these state law claims from the CHRO, this Court is without subject matter jurisdiction over Plaintiff's state law CFEPA claims.  As a result, this Court must dismiss Counts One and Two of Plaintiff's Complaint for lack of subject matter jurisdiction.").

Plaintiff, in Opposition, "concedes that, while he did obtain a 'right to sue' letter from the [EEOC], he did not receive a release of jurisdiction from the CHRO prior to filing suit."  [ECF No. 28 at 11].  He claims, however, to have "remedied the issue," *id.*, in that "[o]n November 7, 2019, Plaintiff requested a release of jurisdiction from the CHRO."  *Id.*  Therefore, Plaintiff argues, "the factual basis for Defendant's argument no longer exists" and "the interests of judicial economy call for the Court to retain Counts One and Two."  *Id.*  The Court disagrees.

As argued by Americares and as previously found by the Court, failure to obtain a release of jurisdiction from the CHRO prior to filing suit under the CFEPA is an absolute bar to the Court's subject matter jurisdiction, *Winter*, 2016 U.S. Dist. LEXIS 132114, at *9-10, which requires the Court to dismiss Counts One and Two.  *See* Fed. R. Civ. P 12(h)(3) ("If the court determines at any time that it lacks

12

subject-matter jurisdiction, the court must dismiss the action.").   In light of Plaintiff's assertion that he has requested a release of jurisdiction from CHRO, however, the Court dismisses Counts One and Two without prejudice to Plaintiff filing an Amended Complaint within 14 days of the date of this Order alleging release of jurisdiction from CHRO and attaching the release as an exhibit.  *See Duarte v. W. Conn. Health Network*, No. 3:16-cv-01757 (JAM), 2017 U.S. Dist. LEXIS 106490, at \*4 (D. Conn. July 11, 2017) ("Plaintiff's CFEPA claims (Counts Five and Six) are dismissed without prejudice to plaintiff's filing of an amended complaint by August 10, 2017, if she can establish that she timely exhausted her remedies."); *see also Desardouin v. UPS*, 285 F. Supp. 2d 153, 159 (D. Conn. 2003) ("Because of the plaintiff's failure to allege in his complaint CHRO's release to sue, the court dismisses the discrimination claim brought pursuant to [CFEPA], with leave to replead, if filed within twenty days.").   If Plaintiff files a separate action within thirty-five (35) days of the date of this decision asserting this dismissed claim, he must also file a notice of related case under the local rules of this district.

### B.   Count Three (ADA Discrimination)

Americares argues that Plaintiff cannot make out a *prima facie* case of disability discrimination under the ADA, which consists of a showing that "(1) the Defendant is subject to the ADA; (2) the Plaintiff was a person with a disability within the meaning of the ADA; (3) the Plaintiff was otherwise qualified to perform

the essential functions of his job, with or without reasonable accommodation; and (4) the Plaintiff suffered an adverse employment action because of his disability," [ECF No. 14 at 8-9 (citing *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003))], because his allegations regarding element two, i.e. whether he was disabled, are lacking. *Id.* at 9-11. That is so, according to Americares, because Plaintiff "recites the talismanic elements of a cause of action for discrimination based on disability under the ADA, but he fails to offer anything more than conclusory allegations that his alleged disability substantially limits his ability to work." *Id.* at 9. Specifically, "Plaintiff fails to explain how, if at all, [his] alleged conditions substantially limit his ability to work." *Id.* at 10. And, Americares notes, Americares' supervisors "embrace[d]" Plaintiff's unique attributes and did not "see [them] as a negative," further undermining any notion that Plaintiff had a disability. *Id.* Finally, Americares argues, that while "working" is considered a major life activity, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* (quoting *Mazzeo v. Mnuchin*, 751 F. App'x 13, 15 (2d Cir. 2018)).

In response, Plaintiff asserts that Americares' "argument ignores the ADA Amendments Act of 2008, P.L. 110-325 ("ADAAA"), and would have the Court rely upon a pre-2008 interpretation of the ADA that specifically was rejected by Congress." [ECF No. 28 at 12]. Specifically, Plaintiff notes that "[p]ursuant to 42 U.S.C. § 12102(4)(A), whether or not a Plaintiff has a disability pursuant to the

14

ADA is to be interpreted in favor of broad coverage," and "42 U.S.C. §12102(4)(E)(1) states that the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures, such as learned behavioral modifications." [ECF No. 28 at 13]. Further, Plaintiff argues that:

> Congress thus has made clear that whether a Plaintiff's claimed disability 'substantially limits' one or more major life activities should be interpreted expansively, in favor of coverage by the ADA. In considering whether an impairment substantially limits an individual in a major life activity, the statutory text is to be construed 'broadly in favor of expansive coverage,' keeping in mind that the language 'is not meant to be a demanding standard.' 28 C.F.R. § 36.105(d)(1)(i). This interpretation is consistent with the purpose of the ADAAA, which was passed to 'reinstat[e] a broad scope of protection to be available under the ADA.' *Summers v. Altarum Inst. Corp.*, 740 F.3d 325, 329 (4th Cir. 2014) (quoting [ADAAA] § 2(b)(1)).

[ECF No. 28 at 13]. Finally, Plaintiff asserts that when viewed "expansively" with a view toward "reinstat[ing] a broad scope of protection to be available under the ADA," he has plausibly alleged that he is disabled within the meaning of the ADA, given that he:

> has a learning disability, which was diagnosed when he was a child; it is a combination of dyslexia, slow lag, auditory processing disorder, and attention deficit disorder and ADD/ADHD; his disability limits the pace at which he processes information, including taking in information correctly, making sense of it and responding; Plaintiff is unable to process information like other similarly situated employees; his particular deficit usually results in significant communication issues with others and generally leads to misunderstandings and/or miscommunications; Plaintiff's difficulty in processing information usually results in his taking a stance on a particular issue and then not budging from that position; more often than not, some portion of information may be missing but,

15

> nevertheless, his mind draws a logical connection and/or conclusion and does not budge from it; and his disability also affects his spelling and grammar.

[ECF No. 28 at 14-15 (citing Complaint ¶¶ 9,10].  The Court agrees.

Plaintiff's allegations concerning his disability are not merely "talismanic elements of a cause of action for discrimination based on disability under the ADA," nor are they mere "conclusory allegations," but rather describe a person with significant shortcomings in his ability to quickly process information as compared to similarly situated employees.  This is especially so given that the determination of whether an impairment substantially limits a major life activity must be made without regard to the ameliorative effects of mitigating measures, such as "learned behavioral . . . modifications," 42 U.S.C. § 12102(4)(E)(i)(IV), which means that the disability determination must be made without reference to Plaintiff's ability to overcome his limitations by, for example, taking copious notes.  Moreover, EEOC regulations define "major life activities" as including "learning, reading, concentrating, thinking, communicating, interacting with others, and working," 29 CFR § 1630.2(i)(1)(i), which Plaintiff may have been significantly limited in participating in, especially since the term "major" in "major life activities" "shall not be interpreted strictly to create a demanding standard for disability.  ADAAA Section 2(b)(4) (Findings and Purposes)."  29 CFR § 1630.2(i)(1)(i)(2) (cited by 1 Jonathan R. Mook, *Americans with Disabilities Act: Employee Rights & Employer Obligations* § 3.02[4][d][ii] n.83 (MB 2020)).

16

Additionally, Americares' argument that Plaintiff's "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working," [ECF No. 14 at 11 (quoting *Mazzeo v. Mnuchin*, 751 F. App'x 13, 15 (2d Cir. 2018))], is unavailing.  In *Mazzeo*, the plaintiff had a temporary shoulder problem which prevented him only from executing duties as a special agent, and he returned to full duty, 751 F. App'x at 15, which led the court to find no disability.  *Id.*  Here, Plaintiff's condition is neither transient nor temporary; it has existed since his childhood and there is no allegation that it is curable.  It would likely affect any job he might attempt to perform to the extent that it involves processing information and interacting with others.

In addition, the assertion that Americares' executives "embrace[d]" Plaintiff's unique attributes and did not "see [them] as a negative" raises a factual question as to Plaintiff's assertion that he was perceived or "regarded as" being disabled, but is not enough for the Court to rule as a matter of law that Americares did not perceive the Plaintiff as disabled in the face of Plaintiff's allegations to the contrary.

"The term 'disability' means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment."

17

42 U.S.C. § 12102(1) (emphasis added).   And, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(a).

The ADAAA, as in other areas, broadened the applicability of the "regarded as" prong of the definition of disability, such that "coverage under this prong should not be difficult to establish."  1 Mook, *Americans with Disabilities Act: Employee Rights & Employer Obligations* § 3.02[1][b][i].

It is well-settled in the Second Circuit that "those persons who do not in fact have the condition which they are perceived as having, as well as those persons whose mental or physical condition does not substantially limit their life activities . . . may be subjected to discrimination on the basis of their being regarded as handicapped." *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997) (quoting *School Bd. v. Arline*, 480 U.S. 273, 279 n.4 (1987)).  "Rather, an individual is covered by the 'regarded as' prong of the definition of disability in the ADA and the RHA if he 'has none of the impairments defined in [the definition of the term 'impairment'] but is treated by a covered entity as having a substantially limiting impairment.'" *Id.* (quoting 29 C.F.R. § 1630.2(l)).  "This turns on the employer's perception of the employee, a question of intent, not whether

the employee has a disability." *Id.* (citing *Holihan v. Lucky Stores, Inc.*, 87 F.3d 362, 366 (9th Cir. 1996) (affirming dismissal of actual disability claim while reversing dismissal of "regarded as" claim, after determining that evidence would support conclusion that employer believed plaintiff to have a disabling mental impairment)).

Here, Plaintiff has at least alleged that Americares perceived him as disabled.  In the Complaint, Plaintiff alleges that, during his review, his immediate supervisor, Mr. Selkowitz, wrote that "I think the team has done their best to adapt to Marc's learning style and information processing."  [ECF No. 1 ¶ 32 (emphasis in Complaint)].  Later, Plaintiff alleges that Ms. Kukula, also apparently in his chain of command as Americares' Associate Director of Content Development, provided significant assistance to Plaintiff in assisting him with overcoming his disability and completing several time-sensitive tasks while on assignment in Puerto Rico.  *Id.* ¶¶ 34, 36.

Americares does not dispute this, and even cites the underlined text above, but argues that "these allegations fail to establish that he is *substantially* limited in any major life activity."  [ECF No. 14 at 10 (emphasis in original)].  But that is not the standard, as one can be "regarded as" disabled without being substantially limited in any major life activity.  42 U.S.C. § 12102(3)(a) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an

action prohibited under this Act because of an actual or perceived physical or mental impairment <u>whether or not the impairment limits or is perceived to limit a major life activity</u>.") (emphasis added).  Finally, Americares argues that Plaintiff's supervisor, Mr. Selkowitz, did not regard Plaintiff's disability "as a negative." [ECF No. 14 at 11].  But that says little about whether Plaintiff was "regarded as" disabled by Americares.  "['Regarded as' disability] turns on the employer's perception of the employee, a question of intent, not whether the employee has a disability."  *Francis*, 129 F.3d at 284 (citing *Holihan*, 87 F.3d at 366 (affirming dismissal of actual disability claim while reversing dismissal of "regarded as" claim, after determining that evidence would support conclusion that employer believed plaintiff to have a disabling mental impairment)).  Here, the Complaint's allegations could support a claim for "regarded as" discrimination.

In sum, Plaintiff has plausibly alleged that he was disabled when he was terminated by Americares under both the actual disability and "regarded as" prongs of the definition of disability.  Americares' Motion to Dismiss Count Three is, therefore, DENIED.

### C.    <u>Count Four (ADA Hostile Work Environment)</u>

Americares argues that Plaintiff fails to plausibly allege a hostile work environment under the ADA (i) because doing so requires allegations "that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment," [ECF No. 14 at 12 (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012))], and (ii) because "[i]solated, minor acts or occasional episodes do not warrant relief," *id.* (quoting *Miller v. Ethan Allen Global, Inc.*, 3:10-cv-01701 (JCH), 2012 U.S. Dist. LEXIS 72572, at *21 (D. Conn. May 21, 2012)), but Plaintiff "identifies only a *single* incident that, construed most generously, might have been offensive to Plaintiff," *id.* (emphasis in original), which "hardly meets the demanding standard applicable to a claim for hostile work environment under the ADA." *Id.* at 13.  Because of this, Americares argues, "Plaintiff's Count Four should be dismissed for failure to state a claim upon which relief can be granted." *Id.*

Plaintiff counters that a claim for hostile work environment has an objective and a subjective component, in that "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive," [ECF No. 28 at 17 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)], and that the single incident in which he was called a "pussy" was "sufficiently severe to meet both the subjective and objective elements of a hostile work environment."  *Id.* at 18.  Moreover, Plaintiff argues, that one incident "is not the only allegation to support Plaintiff's hostile work environment claim."

*Id.*  Plaintiff argues that he alleged a number of work issues that can constitute a "hostile work environment," including:

- "in paragraph 20 Plaintiff alleges that his immediate supervisor, Mr. Selkowitz, did nothing to prevent employees from bypassing Plaintiff and going to his subordinate for projects"

- "in Paragraph 23, Plaintiff alleges that Mr. Selkowitz began to exclude him from company meetings, project meetings and other functions, that his input was no longer sought with respect to meetings, decisions and planning in his department or how it related to his subordinate, and that Mr. Selkowitz would reassign Plaintiff's jobs and duties to his subordinate"

- "Mr. Selkowitz also created a flow chart that showed that Plaintiff's responsibilities had been reduced and that he was being isolated, to the extent that he was reassigned, his subordinate was reassigned to another manager, and Plaintiff had no link to anyone else in the organization other than Mr. Selkowitz" (citing Complaint ¶ 24)

[ECF No. 28 at 18-19].  Plaintiff argues that these allegations, which show that he "was humiliated by his supervisor, intentionally 'frozen' out of his job responsibilities, and isolated within the organization," are "sufficient to set forth a claim of hostile work environment," *id.* at 19, and that Americares' Motion to Dismiss Count Four should, therefore, be denied.

Americares replies that these allegations are not sufficient to support a claim for hostile work environment under the ADA because they are not, "on their face," "inherently or evidently hostile" in that they do not show that Plaintiff's workplace was so "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the

victim's employment."   [ECF No. 29 at 5 (citing *Torres v. Pisano*, 116 F.3d 625, 630-31 (2d Cir. 1997)].  The Court agrees.

The Second Circuit has recently held that an ADA plaintiff may proceed under a hostile work environment theory.  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (holding that "disabled Americans should be able to assert hostile work environment claims under the ADA . . . and here we so recognize.").  "Hostile work environment claims . . . cognizable under the ADA . . . are analyzed under the same standards as those used in Title VII claims."  *De La Cruz v. Guilliani*, No. 00 Civ. 7102 (LAK) (JCF), 2002 U.S. Dist. LEXIS 19922, at *28 (S.D.N.Y. Aug. 23, 2002).  "To establish such a claim, the plaintiff must show that based on the 'totality of circumstances,' the workplace was 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' as to constitute a hostile working environment."  *Id.* (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767 (2d Cir. 1998) and citing *Scott v. Memorial Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002)).  "The standard . . . is a 'demanding one,' and a plaintiff must establish that the alleged harassment was 'offensive, pervasive, and continuous enough' to create an abusive working environment."  *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584-85 (S.D.N.Y. 2008).  "[I]n order to prevail on a hostile work environment claim, an ADA plaintiff must show that 'the

harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment,' and was based on the plaintiff's disability." *Murtha v. N.Y. State Gaming Comm'n*, No. 17 Civ. 10040 (NSR), 2019 U.S. Dist. LEXIS 159783, at *35 (S.D.N.Y. Sept. 17, 2019).  "Among the factors to be considered in determining whether conduct is sufficiently hostile under the totality of the circumstances are: frequency; severity; whether the conduct is physically threatening or humiliating; and whether it interferes with an employee's performance." *De La Cruz*, 2002 U.S. Dist. LEXIS 19922, at *28-29.

Here, although the one incident in which Plaintiff was called a "pussy" was undoubtedly humiliating and unprofessional, it is not by itself sufficient to constitute a hostile work environment.  *See Bertuzzi v. Copiague Union Free Sch. Dist.*, No. CV 17-4256 (SJF) (AKT), 2020 U.S. Dist. LEXIS 43351, at *42 (E.D.N.Y Mar. 9, 2020) ("[s]everity is a hallmark of a hostile work environment claim.  Such claims are not intended to promote or enforce civility, gentility or even decency.").   And, while the other incidents alleged were negative from a professional standpoint, they were not "physically threatening" or "sufficiently hostile" to constitute a "hostile work environment" under the ADA, especially given that there are no allegations that any them had anything to do with Plaintiff's alleged disability.  *See Zabar v. N.Y. Dep't of Educ.*, No. 18 Civ. 6657 (PGG), 2020 U.S. Dist. LEXIS 83840, at *14, 28 (S.D.N.Y. May 12, 2020) (granting motion to dismiss ADA hostile work environment claims when "the Amended

Complaint does not plead facts suggesting that Defendants create[d] [a hostile work] environment because of the [P]laintiff's disability"; rather, "Plaintiff merely recounts the timing of these actions"); *Bertuzzi*, 2020 U.S. Dist. LEXIS 43351, at *42-43 (granting motion to dismiss ADA hostile work environment claims where "Plaintiff allege[d] episodic acts which were not physically threatening or sufficiently severe or pervasive," as compared to the plaintiff in *Fox*, 918 F.3d at 74, "holding that 'months and months' of disparaging discriminatory comments lobbed at Plaintiff 'whenever' he would experience tics as a result of his disability were sufficient to create an issue of fact on summary judgment as to whether Plaintiff was subject to a hostile work environment under the ADA"); *Kelly v. North Shore-Long Island Health Sys.*, No. 13-CV-1284 (JS) (WDW), 2014 U.S. Dist. LEXIS 85447, at *26 (E.D.N.Y. June 22, 2014) (granting motion to dismiss ADA hostile work environment claims even where "Plaintiff allege[d] that Sabatino (1) called her a 'threat to the public'; (2) placed her on administrative leave for an indefinite period of time; and (3) sent her accusatory and threatening letters warning her that if she contacted her case managers regarding her employment status, that further action against would be taken" because such acts were "isolated, minor acts or occasional episodes do not warrant relief under a hostile environment theory") (citations omitted).  *See also Monterroso*, 591 F. Supp. 2d at 585 (finding no hostile work environment when plaintiff's "salary was not raised in a timely fashion; she did not receive the salary continuation she was due; her

medical information was discussed with other employees without her permission; and her assignments were changed at random" because "conduct of which plaintiff complains is far from 'offensive, pervasive, and continuous enough' to meet the 'demanding' standard for establishing an abusive working environment under the ADA"); *De La Cruz*, 2002 U.S. Dist. LEXIS 19922, at *28-29 (dismissing ADA hostile work environment claims when "plaintiff has not alleged that any of the defendants physically threatened him.  Nor has he alleged that anyone made disparaging comments related to his disability . . . plaintiff only points to one-time, and relatively minor, instances of alleged mistreatment or humiliation in which no overt references to his disability were made"); *Scott*, 190 F. Supp. 2d at 599 ("Even if the plaintiff thought that the question of whether she would work full-time or resign was asked too often and that Dr. Bertino expressed unhappiness with her reduced capacity to work, she has not demonstrated that the workplace was so 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' as to constitute a hostile working environment . . . the Second Circuit has made it clear that insensitive comments are not per se unlawful") (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).

In sum, Plaintiff's allegations that Americares' executives engaged in unprofessional conduct and that Americares took negative actions, up to and

including termination, were not so severe as to plausibly amount to claims of a hostile work environment. Americares' Motion to Dismiss Count Four is, therefore, GRANTED.

### D.    Count Five (Intentional Infliction of Emotional Distress)

As regards Intentional Infliction of Emotional Distress ("IIED"), Americares argues that Plaintiff "sets forth nothing more than a talismanic recitation of the elements of a claim for intentional infliction of emotional distress," [ECF No. 14 at 14], alleging "summarily, and without any factual support, that 'Defendant was fully aware of the extreme, inappropriate, offensive, and hostile working environment that Plaintiff was subject to every day and allowed it to continue.'" *Id.* (quoting Complaint ¶ 101). "In fact," Americares argues, "the only specific example of *any* alleged conduct that Plaintiff points to" is the incident where he was called a "pussy," but such an insult was not "so extreme and outrageous that it goes beyond all possible bounds of decency," *id.* at 15 (emphasis in original) (quoting *Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 552 (D. Conn. 1996), and Count Five should, therefore, be dismissed.

Plaintiff concedes that insults alone do not rise to the "extreme and outrageous" level of conduct sufficient to support a cause of action for IIED, but cites *Leone v. New England Communications Corp.* as an analogous case, because there the court found that calling plaintiff "dago, wop, Father Sarducci or Gimabroni," placing "sexually offensive comments and pictures on his

27

computer," and making "comments about his penis, his sexual performance, homosexuality and the like" were sufficiently extreme and outrageous as to constitute IIED.   [ECF No. 28 at 20-21].   The Court disagrees that *Leone* is analogous to the instant case.

In the State of Connecticut, to succeed on a claim for intentional infliction of emotional distress a plaintiff must show

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Rivera v. Thurston Foods, Inc.*, 933 F. Supp. 2d 330, 343 (D. Conn. 2013) (citing *Petyan v. Ellis*, 200 Conn. 243, 253 (2006)).

The Connecticut Supreme Court provided the following guidance to determine whether conduct is "extreme and outrageous":

> Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"  Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.

*Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000) (internal quotations and citations omitted).  In considering whether a plaintiff's claim for IIED sufficiently alleges extreme and outrageous conduct, the court evaluates "the employer's conduct, not the motive behind the conduct."  *Miner v. Cheshire*, 126 F. Supp. 2d 184, 195 (D. Conn. 2000) (citation omitted).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine."  *Appleton*, 254 Conn. at 210 (citing *Bell v. Bd. of Educ.*, 55 Conn. App. 400, 410 (1999)).

The facts alleged by Plaintiff do not describe conduct that rises to the legal standard of extreme and outrageous conduct.  Nothing described in the allegations in the Complaint rises above conduct that is merely insulting or results in hurt feelings.  Nothing described in the Complaint is "beyond all possible bounds of decency."  *Little v. Yale Univ.*, 92 Conn. App. 232, 239 (2005) (quotation and citation omitted).  Plaintiff alleges simply that he was insulted, limited in his job responsibilities, and then wrongfully terminated.  However, Americares' conduct must be extreme and outrageous to state an IIED claim. *Miner*, 126 F. Supp. 2d at 195.  Defendant's alleged *conduct* does not rise to the standard of extreme and outrageous conduct.  *See, e.g.*, *Appleton*, 254 Conn. at 210-12 (holding that teacher failed to state a claim for IIED when she alleged the principal placed her on administrative leave, submitted her to two psychological evaluations, called the police to have her escorted out of the building, collected

information on her and conducted meetings outside her presence, made condescending comments to her in front of coworkers, and telephoned the teacher's daughter representing that the teacher had been acting differently); *Bator v. Yale-New Haven Hosp.*, 73 Conn. App. 576, 576-78 (2002) (affirming decision of trial court to grant defendant's motion to dismiss plaintiff's intentional infliction of emotional distress claim where plaintiff alleged that defendants disciplined him for failing to report to work even though he was under a physician's care, paid him less than those with less experience, told him to seek psychiatric help, gave him a written warning when he complained about a rotation change, and recommended that plaintiff attend anger management classes after having two verbal altercations).

In sum, Plaintiff's allegations of Americares' conduct, even if true, are not sufficiently outrageous as to support a claim for intentional infliction of emotional distress, for the reasons described above.

Accordingly, Defendant's motion to dismiss is GRANTED and the court dismisses Count Five of Plaintiff's complaint.

## IV. CONCLUSION

For the foregoing reasons, Americares' motion to dismiss [ECF No. 13] is GRANTED-IN-PART.   Counts Four, Five, Six, and Seven are DISMISSED with prejudice.   Counts One and Two are DISMISSED without prejudice to Plaintiff filing an Amended Complaint within 14 days of the date of this Order alleging

release of jurisdiction from CHRO and attaching the release as an exhibit. Americares' Motion to Dismiss Count Three is DENIED, and Plaintiff's actual and "regarded as" disability claims will go forward.

IT IS SO ORDERED

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: June 29, 2020.

31