UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARC D. BIRNBACH,     :
  Plaintiff,       :
              :
  v.           :  Case No. 3:19-cv-01328 (VLB)
              :
AMERICARES FOUNDATION INC.,  :
  Defendant.      :  September 18, 2021

MEMORANDUM OF DECISION GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, [ECF NO. 36]

This employment discrimination action is brought by Plaintiff, Marc D. Birnbach, a former marketing multimedia manager of the Defendant, Americares Foundation Inc. ("Americares" or "Defendant"). Plaintiff asserted causes of action for discrimination based on disability and regarded as disability pursuant to the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1) (Count I); hostile work environment pursuant to the CFEPA (Count II); discrimination based on disability and "regarded as" disability pursuant to the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* (Count III); hostile work environment pursuant to the ADA (Count IV); intentional infliction of emotional distress (Count V); negligent infliction of emotional distress (Count VI); and breach of the covenant of good faith and fair dealing (Count VII). [ECF No. 1].

On September 25, 2019, Americares moved to dismiss Plaintiff's claims in their entirety, [ECF No. 13], which the Court granted-in-part on June 29, 2020, dismissing Counts I and II "without prejudice to Plaintiff filing an Amended Complaint within 14 days of the date of th[at] Order alleging release of

jurisdiction from [the Connecticut Commission on Human Rights and Opportunities] and attaching the release as an exhibit," [ECF No. 33 at 13], and dismissing Counts IV through VII with prejudice. *Id.* at 20-30.

Plaintiff did not re-plead Counts One and Two, which left Plaintiff's Count Three, setting forth a claim for discrimination based on disability and "regarded as" disability pursuant to the ADA, as Plaintiff's only remaining cause of action.

On October 27, 2020, Americares filed the instant motion for summary judgment and memorandum in support thereof. [ECF No. 36]. For the following reasons, Americares' motion for summary judgment is GRANTED.

## I. MATERIAL FACTS

The Court draws the following facts from the Parties' Local Rule 56(a) Statements of Material Facts as supported by evidence in the record.

"Plaintiff, Marc Birnbach, is and was, at all relevant times, a photographer, videographer, and editor." [ECF No. 36-8 (Defendant's Local Rule 56(a)1 Statement of Undisputed Material Facts ("Def.'s Stmt.") ¶ 1)]; [ECF No. 39-1 (Plaintiff's Local Rule 56(a)2 Statement of Facts ("Pl.'s Stmt.") ¶ 1)]. "Defendant is, and was at all relevant times, a non-profit global health focused relief organization, headquartered in Stamford, Connecticut." Def.'s Stmt. ¶ 2; Pl.'s Stmt. ¶ 2.

Plaintiff has an impairment consisting of "a combination of dyslexia, slow lag, auditory processing disorder, and attention deficit disorder and attention

deficit hyperactivity disorder ('ADD/ADHD')."  [ECF No. 39-1 (Plaintiff's Local Rule 56(a)2 Additional Material Facts ("Pl.'s Add'l Facts") ¶ 2]; [ECF No. 39-4 Plaintiff's Opposition Exhibit 2 (Transcript of Marc D. Birnbach Deposition dated June 23, 2020 ("Pl.'s Ex. 2") at 59:1-6 (confirming that his impairment consists of "a combination of dyslexia, low lag, auditory processing disorder, and attention deficit disorder and attention deficit hyperactivity disorder")].  "Plaintiff's disability limits the pace at which he processes information, including taking in information correctly, making sense of it and responding."  Pl.'s Add'l Facts ¶ 3. "Plaintiff is unable to process information like other persons," and his "particular deficit results in significant communication issues with others and generally leads to misunderstandings and/or miscommunications."  *Id.* ¶¶ 4-5.

"Plaintiff met with Jed Selkowitz on or about April 7, 2016 at Defendant's headquarters for an interview."  Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 3.  "Following Plaintiff's interview, he was sent a written offer of employment for the position of interim Manager, Multimedia, as part of Defendant's Marketing team by letter dated April 8, 2016."  Def.'s Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.  "The offer letter indicated that Jed Selkowitz would be Plaintiff's immediate supervisor."  Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 5.

"Plaintiff started in this position as an employee of Defendant on April 13, 2016."  Def.'s Stmt. ¶ 6; Pl.'s Stmt. ¶ 6.  "By letter dated May 24, 2016, Plaintiff's

employment status was changed from interim to that of a regular full-time, at-will employee."  Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.

Plaintiff disclosed his impairment to Selkowitz.  Pl.'s Add'l Facts ¶ 6; *see also* Pl.'s Ex. 2 56:14-22, 62:4-9 ("Q.  . . . I think you mentioned in passing you told Jed you're - - Is it a kinesthetic learner?"  A.  Correct.  Q.  And what does that mean? A.  That I'm both audio - - well, I wonder; but it's I'm more of a visual, that it's hard for me to understand and absorb a lot of information when it's done just verbally. . . . Q.  . . . And am I correct in my understanding that while you didn't tell Jed the technical diagnosis during the interview, it sounds like you described to him sort of the effects of the diagnosis, correct? A.   Yes."); [ECF No. 39-5 Transcript of Jed Selkowitz Deposition dated July 24, 2020 ("Pl.'s Ex. 3") at 15:21-16:14 ("Marc would speak to me about the potential of processing things differently, the need to write things down in detail, you know, just things like that. Q. And did he discuss with you why he would, for example, need to write things down frequently? A.  Again, to the best of my recollection, it was based on, you know, how he processed things, you know, whether it was, again, sort of hearing things in meetings and needing to sort of digest them or from a memory perspective to need to write it down and refer back to notes, but that's typically the extent of it.")].

At his deposition, Plaintiff testified regarding his impairment's impact on his work output at Americares:

4

> Q. Okay.  What impact did your learning disability have on your ability to do your job at Americares?
>
> A. If you're asking my thoughts, I thought it was minimal.  I thought that just proven with the metrics as far as measurables of what I created, when I created, how I created, where I delivered, it showed productivity in multimedia content creation that had never happened at Americares in the history of Americares.  The amount of content I created for them far surpassed five years of the previous person in my position in what I did in just one year.
>
> So my disabilities did not weigh in on the productivity of my job.  If anything, it – I felt like it strengthened me to learn more how to operate and work with people and my team in that capacity.
>
> . . .
>
> Q. Do you believe, as you sit here today, that your learning disability substantially limited your ability to work at Americares?
>
> A. No.

[ECF No. 36-3 Defendant's Motion for Summary Judgment Exhibit A ("Def.'s Ex. A") (Birnbach Depo. Tr. 152:5-10, 186:13-16)].

At some point "Plaintiff began to be excluded from . . . company meetings, project meetings and other functions."  Pl.'s Add'l Facts ¶ 8.  "Plaintiff's input and his involvement were not sought with respect to meetings, decisions and planning in his department or as it related to his subordinate.  Mr. Selkowitz would reassign jobs and duties that were Plaintiff's responsibility to his subordinate, Jake Rauscher."  Id. ¶¶ 9-10.  "At some point, Mr. Selkowitz generated a flow chart of staff members and their areas of responsibility[, which showed] that Plaintiff's responsibilities as Multimedia Manager had been reduced and that Plaintiff was being isolated in his employment duties and office

5

environment." *Id.* ¶¶ 11-12.  "It was also clear to see that Plaintiff had been reassigned, that Mr. Rauscher was reassigned to another manager and that Plaintiff had no link to anyone other than Mr. Selkowitz on the flow chart." *Id.* ¶ 13.

On July 31, 2018, Plaintiff, Jed Selkowitz and senior manager Kevin Gilrain met regarding Plaintiff's plan to relocate from Stamford, Connecticut, where Americares is headquartered, to Wisconsin.  [ECF No. 42-7 (Email exchange between Plaintiff and Jed Selkowitz regarding relocation meeting)].  In an email exchange documenting the results of that meeting, Jed Selkowitz noted that "the process by which we got to today's discussion was not ideal," in that Selkowitz first heard about Plaintiff's relocation not from Plaintiff, but from several co-workers who "ask[ed] if [Plaintiff] was leaving the company." *Id.*  It was also not ideal, in Selkowitz's view, because it occurred before Americares implemented "a formal flexible work arrangement (FWA) policy," that might have set parameters for such a move, Selkowitz, Plaintiff's direct supervisor, was not involved in the move plan, and "[r]umors continue[d] to come to [Selkowitz's] office daily about the potential implications of [Plaintiff's] move." *Id.*  Selkowitz also expressed concern that Plaintiff "edit[s video] on different software than Jake [Rauscher]," but noted that Plaintiff "suggested that [he had] found a solve" and expressed an expectation that Plaintiff and Jake Rauscher would be able to set up a system that would "seamlessly integrate" their efforts while Plaintiff worked remotely. *Id.*

6

Plaintiff responded that he was "excited" that he could "present the team with a highly adaptable and easy plan that won't disrupt our workflow or challenge how we team up to execute projects."  *Id.*

"Plaintiff's annual review for fiscal year 2018 [covering July 1, 2017 to June 30, 2018] was held on August 16, 2018 at 3:00pm and was attended by Plaintiff, Jed Selkowitz, and Kevin Gilrain."  Def.'s Stmt. ¶ 8; Pl.'s Stmt. ¶ 8; [ECF No. 39-6 (Birnbach Annual FY2018 Goal & Performance Review) ("Annual Review")].

Plaintiff's Annual Review communicated numerous deficiencies in Plaintiff's execution of assigned duties:

- "[O]n site in Liberia, Marc did not seem to have full command of the technology . . . one day the battery was uncharged . . . Marc didn't know there was a 'straight' direction to the camera . . . allow[ing] us to choose what the viewer saw . . . While Marc has great raw talents, sometimes he does not invest enough in the book learning of his craft."

- "I'd asked Jake, Moataz and Marc to collaborate on . . . developing new and consistent on-screen graphics . . . and spoke to Marc about taking a leadership role in this process.  All procrastinated on this assignment, but it was Jake and Moataz who ultimately took the lead and presented their recommendations. . . . Marc [also needs] flexibility in . . . us[ing] the same video editing platform [as Jake]. . . . We broke little new ground . . . ."

- "I have proposed in the past that Marc partner with [Ted and Sam Kelly] to better understand the performance of our video content . . . I have not observed this happening"

- "We have a social listening tool – Falcon – that delivers strong data on our social posts.  Partnering with Sam would have revealed this new tool in FY18. . . . We held one session in my office that I had to initiate, but have since not had team discussions about what works."

- "[T]he reason this management change happened [shifting Jake Rauscher from Plaintiff's supervision to another manager] [is because] Marc was not

effectively managing Jake after repeated coaching attempts.  Despite some effort by Marc to improve his management of Jake, I observed a continuing erosion of the relationship and Jake became a flight risk.  Marc made efforts to establish a routine with Jake, [but t]hese routines did not last and (by personal observation and feedback delivered to me), Marc's feedback came off more as criticism of Jake's work."

- "Based on my observations of Marc, he sometimes has difficulty starting and completing projects . . . .  Marc has even misled teammates about his progress."

- "[In one instance] Marc was supposed to be a leader among the photographers, but he showed up 30 minutes late . . . missing the pre-event brief . . . [because of a personal] freelance gig."

- "Marc took the computer he had purchased to a freelance gig [but] a memory card of Jake's had been downloaded onto that computer by mistake.  Without confirming we had a backup of that card, Marc deleted it from the computer.  We lost an entire card of Jake's content.  While others were also to blame for this, Marc took little to no responsibility at the time and sought to put blame on teammates during our discussion."

- "Marc took a first-class seat on the charter, leaving the [Americares] donor assigned to that seat to go back to economy.  It was a very embarrassing situation . . . While Marc acknowledged it was inappropriate when it was pointed out to him, he clearly didn't recognize it at the time."

- "Marc undermined [another manager by] ask[ing a junior person] if he had a career path established . . . and when [he] said 'no', Marc made a point to tell him that was a 'big miss' and should be something [his manager] should be helping him with.  . . . Marc could have spoken to [the manager] about it instead of undermining her."

- "[I]t is Marc who I have observed often passing projects to Jake or Chris with little/no notice and often under circumstances that seem difficult to imagine and/or without asking [their manager]."

- "Marc has flashes of incredible collaboration with internal partners.  I have observed Marc experience a great rapport and success working with certain colleagues, but also some challenging relationships with others.  Based on my observations, Marc has not demonstrated deeper engagement with our programmatic work.  Marc does surface new ideas for

video content, but, the ideas often are not executable, off strategy or don't align with our top programmatic priorities, therefore they often need refinement/redirection."

- "Marc had been a strong infusion of creativity and photography and video editing talent, which created rationale for looking past certain performance issues and concerns, but his strengths and best performances no longer outweigh gaps in his workplace production, issues with team cohesiveness, and lack of consistent work ethic and productivity.  We must either find a path forward for Marc that enhances his performance or discuss alternatives. . . . The first step will be to develop a Performance Improvement Plan (PIP) that will outline clear expectations across specific projects. . . . We will develop this together and agree on the plan ahead."

- "Marc's unique perspective and approach to projects was a key reason I was excited he was joining our team.  We do not see it as a negative and I think the team has done well to embrace a nonlinear content creator who has outside the box ideas.  I think the team has done their best to adapt to Marc's learning style and information processing.  I'm not sure I have seen any intolerance for this or short-fuses, rather, there is a feeling that by now, Marc should have a greater command of our work."

[ECF No. 39-6].

"Thereafter, Jed Selkowitz sent a Performance Improvement Plan to Plaintiff on or about September 17, 2018."  Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9.  "Thereafter, a follow-up meeting to Plaintiff's annual review was held on September 21, 2018, attended remotely by Plaintiff with Mr. Selkowitz and Mr. Gilrain."  Def.'s Stmt. ¶ 10; Pl.'s Stmt. ¶ 10.

Six days later, Jed Selkowitz emailed Plaintiff expressing "confus[ion]" about Plaintiff having to mail a thumb drive to Jake Rauscher to share video files when they should have already had a server set up to effect the transfer electronically; the mail transfer cost the team two days on a project with a tight

timeline.  [ECF No. 42-8 ("I've read your note and am very surprised the server was not in place. We discussed this multiple times and shipping a hard drive wasn't the method of file sharing that would be how you guys work together. What a complete waste of two days – it makes it impossible to seamlessly shift projects and share working files.")].

The next day, September 28, 2018 Plaintiff responded stating "still I have to defend myself that I don't process information well when it comes to our mission in medical terms or statistics, and that is a huge part of my life because I don't process information like other people, hence my life in resource classes, special education, and being around mentors.  This is an area of focus, awareness and improvement for Americares if the organization ever does decide to offer employment to people with special needs because as intelligent or creative as I have made myself I still have that learning lag."  [ECF No. 39-8].

"On or about November 7, 2018, Plaintiff was in Los Angeles, California for a free-lance job, using vacation time during his absence from Americares."  Def.'s Stmt. ¶ 11; Pl.'s Stmt. ¶ 11.  "While Plaintiff was in Los Angeles, California, UPS attempted to deliver a package at his home in Wisconsin, which his then-fiancé missed, following which she attempted to pick the package up from UPS without success."  Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 12.  "UPS declined to release the package to Plaintiff's fiancé, notwithstanding the fact that she put Plaintiff on facetime and he attempted to show his photo ID."  Def.'s Stmt. ¶ 13; Pl.'s Stmt. ¶

13.   "Plaintiff then attempted to call UPS, but was met with a long wait time, so he sent a message to UPS through Facebook messenger, 'hoping that maybe this could get elevated to a senior supervisor . . .'"  Def.'s Stmt. ¶ 14; Pl.'s Stmt. ¶ 14.

Plaintiff's message thread to UPS through Facebook stated: "Wishes delivered?  I'm a first responder for an international NPO that had a critical tool being delivered while I am away responding to a disaster.  My day has come to a grinding halt because UPS won't leave my package . . . at my home with my fiancé because she doesn't have the same last name or address. . . . RETHINK how you are shipping your critical supplies in times of disaster because UPS is NOT it."  Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15; [ECF No. 36-4 (Exhibit 1 to Plaintiff's Deposition) (emphasis in original)].

"During the course of his deposition, Plaintiff confirmed that this Exhibit 1 from his deposition appeared to be an accurate copy of his 'text thread' to UPS." Def.'s Stmt. ¶ 16; Pl.'s Stmt. ¶ 16.  "Despite Plaintiff's representation to UPS in Exhibit 1 that he was 'away responding to a disaster', Plaintiff admitted that, at that time, he was on vacation from Americares and in Los Angeles on non-Americares business."  Def.'s Stmt. ¶ 17; Pl.'s Stmt. ¶ 17.  "Plaintiff also admitted that, he was not, at that time, responding to any disaster in his capacity as an employee of Americares."   Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶ 18.   "Plaintiff further admitted that Americares had not sent him to Los Angeles in or around November 7th or 8th 2018 in response to a natural disaster."   Def.'s Stmt. ¶ 19;

Pl.'s Stmt. ¶ 19.  "Plaintiff testified that his reference in Exhibit 1 to his status as 'a first responder for an international NPO' was, in fact, a reference to his role with Americares and that he included that information in his message to UPS in an effort to 'position that the equipment was needed for the work that [he needed] to do.'"  Def.'s Stmt. ¶ 20; Pl.'s Stmt. ¶ 20.

Jed Selkowitz testified during his deposition that "[n]umber one, he was representing himself as a responder . . . he made it seem like his role in our organization was critical to life saving work. It is not."  Def.'s Stmt. ¶ 21.[1]  "Mr. Selkowitz also clarified that the drone at issue with the delivery was not, in any event, an essential piece of equipment and that Americares had its own drone at all relevant times that was available to be deployed if needed."  Def.'s Stmt. ¶ 22; Pl.'s Stmt. ¶ 22.

"Plaintiff further confirmed that he, in fact, wrote the further message to UPS at Exhibit 1, page 2 that stated: 'I've wasted enough time and energy and heard enough about only solutions today.  This feedback has already gone back to our organizations [sic] leadership team and emergency response team to stay clear of UPS.'"  Def.'s Stmt. ¶ 23; Pl.'s Stmt. ¶ 23.

---

[1] Defendant's Rule 56(a)1 Statement characterizes Plaintiff's statement as "false and misleading," which Plaintiff denies, citing to his own deposition testimony, where he stated, "one of my roles is as a first responder for natural disasters." Pl.'s Stmt. ¶ 21 (citing Transcript of Marc D. Birnbach dated June 23, 2020 ("Birnbach Depo. Tr.") at 139:19-140:3).

"Diana Maguire, Vice President of Institutional Relations for Americares, was sent the screen shots of Plaintiff's message thread with UPS by her connection at UPS, Joe Ruiz, by email correspondence."  Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24.  "UPS, at all relevant times, was a corporate partner of Americares and Mr. Ruiz reached out to her in an effort to troubleshoot the issues raised by Plaintiff because he did not want to disrupt an emergency response."  Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25.

"Ms. Maguire, in reading the message thread forwarded to her by Mr. Ruiz, assumed that Plaintiff was deployed for Americares and responding to an emergency, so she attempted to confirm where Plaintiff was, to get information about the package, and to attempt to resolve [the] issue."  Def.'s Stmt. ¶ 26; Pl.'s Stmt. ¶ 26.  "She ultimately contacted Plaintiff directly and learned that, at that time, he was in Los Angeles for a freelance gig."  Def.'s Stmt. ¶ 27; Pl.'s Stmt. ¶ 27.  "Ms. Maguire informed Plaintiff in the course of that telephone call that he had created an 'awkward situation' by 'making it seem as if this is in response to a disaster, which it doesn't appear like it is' and 'putting a relationship that [Americares has] with UPS in jeopardy.'"  Def.'s Stmt. ¶ 28; Pl.'s Stmt. ¶ 28.

"As noted by Ms. Maguire in her deposition testimony, while Plaintiff did not explicitly reference Americares in his communications with UPS, he 'purported to represent an emergency response organization' and he 'purported that the inability to receive this package was impeding the response, that there

13

were people who were not going to get help perhaps for weeks because of the lack of delivery.'"  Def.'s Stmt. ¶ 29; Pl.'s Stmt. ¶ 29.  "Ms. Maguire further testified that Plaintiff 'made it clear that he had reported this to leadership and had requested that they not do business with UPS.'"  Def.'s Stmt. ¶ 30; Pl.'s Stmt. ¶ 30.  "Ms. Maguire further testified that Americares does 'a ton of business with UPS . . . a massive amount of delivery with UPS.'"  Def.'s Stmt. ¶ 31; Pl.'s Stmt. ¶ 31.  "While Ms. Maguire could not state definitively how UPS came to the conclusion that Plaintiff was affiliated with Americares, she did note: '[a]ll you have to do is Google Marc and you know he works for us.'"  Def.'s Stmt. ¶ 32; Pl.'s Stmt. ¶ 32.  Plaintiff himself testified "that his 'photos, assets, anything that I created for Americares . . . was put out publicly with my name spelled correctly. So I mean, my name was searchable in a multitude of ways . . .'"  Def.'s Stmt. ¶ 33; Pl.'s Stmt. ¶ 33.

Plaintiff emailed Jed Selkowitz about the UPS incident, stating that "[t]here was no support of flexibility due to ups [sic] policy[, . . . ] I positioned solutions which were rejected [by UPS, . . .] this stopped my work for [sic] americares today and escalated frustrations [and] I left a generic direct review on facebook about my frustrations with no mention of americares."  [ECF No. 42-10].

Plaintiff also sent an email to Diana Maguire stating "I can not even begin to tell you how humiliating and now fearful I am with my job that UPS caused today for me because they wouldn't deliver a package I needed for work.  I never

once mentioned [Americares] or positioned myself to represent the organization. The search time and steps to contact [Americares by UPS] was wrong.  [UPS] Corporate called me to remedy the package and I have told them I am happy to finally allow my fiancé to retrieve the package in my absence while I am away for work beyond their general hold time.  I also made them aware that I am likely going to lose my job because they reached out to [Americares].  Bottom line is UPS did two major disservices to me and this should never have gone in the direction it did and what a mess they created."  [ECF No. 42-9].

"Ultimately, Plaintiff's exchange with UPS was shared with, among others, Kevin Gilrain and Jed Selkowitz.  Mr. Gilrain discussed the exchange between Plaintiff and UPS with then-CEO of Americares, Michael Nyenhuis, and possibly Jed Selkowitz, although Mr. Selkowitz was traveling to the Far East at the relevant time."  Def.'s Stmt. ¶ 34; Pl.'s Stmt. ¶ 34.  "Mr. Gilrain's discussions with Mr. Nyenhuis focused on '[t]he seriousness of this misrepresentation and plea to UPS to assist [Plaintiff] with a private matter by invoking Americares or invoking the work of Americares if not in name and the representation that they were preventing him from doing his humanitarian work.'"  Def.'s Stmt. ¶ 35; Pl.'s Stmt. ¶ 35.  "Mr. Gilrain and Mr. Nyenhuis discussed the fact that Plaintiff's communications were a 'real breach of appropriate behavior', incorporated 'misrepresentations and untruths', and 'threatening UPS in terms of going back

to [Americares'] leadership team and emergency response team to steer clear of UPS . . .'"  Def.'s Stmt. ¶ 36; Pl.'s Stmt. ¶ 36.

"Mr. Gilrain testified that he had one exchange with Mr. Selkowitz regarding Plaintiff's communications with UPS in an effort to confirm whether Plaintiff's communications with UPS were, in any way, related to his then-pending Performance Improvement Plan, but they determined that Plaintiff's communications with UPS were a 'standalone violation of trust.'"  Def.'s Stmt. ¶ 37; Pl.'s Stmt. ¶ 37.[2]

"Mr. Gilrain and Mr. Nyenhuis had two discussions about the communications between Plaintiff and UPS."  Def.'s Stmt. ¶ 38; Pl.'s Stmt. ¶ 38.

"In the course of those conversations, Mr. Gilrain recommended that Plaintiff be terminated '[f]or the . . . material misrepresentation, the standalone single violation and threat to Americares with a core partner of [Americares].'"  Def.'s Stmt. ¶ 39; Pl.'s Stmt. ¶ 39.[3]

---

[2] Plaintiff's Rule 56(a)2 Statement admits that Mr. Gilrain so testified but denies that he had only a single conversation with Mr. Selkowitz.  [ECF No. 39-1 at 11]. But Plaintiff cites deposition testimony of Mr. Selkowitz in support, the specific pages of which are not included in Plaintiff's filing, and he cites to CHRO filings, neither of which discuss the number of times Mr. Gilrain and Mr. Selkowitz discussed Plaintiff's actions.  This statement is, therefore, deemed admitted.  *See* D. Conn. L. Civ. R. 56(a)(3) ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts.").

[3] Plaintiff admits that Mr. Gilrain so testified but denies "that his was the sole recommendation."  [ECF No. 39-1 at 12 (citing ECF No. 39-10 ¶ 41 ("Mr. Selkowitz, Mr. Gilrain, and Mr. Michael Nyenhuis, President & CEO of Americares, were the primary decision makers with respect to both the hiring and firing of

16

"Mr. Gilrain testified that Mr. Nyenhuis was the ultimate decision-maker with respect to the termination of Plaintiff and that Mr. Selkowitz was not involved in the decision."  Def.'s Stmt. ¶ 40; Pl.'s Stmt. ¶ 40.[4]

"Plaintiff was terminated by a telephone call on November 9, 2018.  During the course of that telephone call, Mr. Gilrain explained to Plaintiff that he was being terminated on the basis of his communications with UPS."  Def.'s Stmt. ¶ 41; Pl.'s Stmt. ¶ 41.

## II.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

---

Complainant") and ECF No. 39-11 ¶ 11(c) (citing Kevin Gilrain and Jed Selkowitz as "the persons recommending the action at issue.")].

[4]  Plaintiff admits that Mr. Gilrain so testified but denies "that Mr. Nyenhuis was the ultimate decision-maker."  [ECF No. 39-1 at 12 (citing ECF No. 39-10 ¶ 41 ("Mr. Selkowitz, Mr. Gilrain, and Mr. Michael Nyenhuis, President & CEO of Americares, were the primary decision makers with respect to both the hiring and firing of Complainant") and ECF No. 39-11 ¶ 11(c) (citing Kevin Gilrain and Jed Selkowitz

(1986)).  This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

## III.   DISCUSSION

As an initial matter, the Court pauses to note that Plaintiff mis-states the legal standard on summary judgment in a disability discrimination case.  Plaintiff

---

as "the persons recommending the action at issue.")].

claims that in such a case, summary judgment is considered an "extreme remedy," and "should be granted only if it is quite clear what the truth is and that no genuine issue remains for trial."  [ECF No. 39 at 7].  The case cited for these propositions, *Egleston v. State Univ. Coll. at Geneseo*, 535 F.2d 752 (2d Cir. 1976), does not say that, and was a case reviewing the grant of a motion to dismiss, not summary judgment, and so is clearly inapposite.  In fact, neither proposition stated by Plaintiff finds support in the Second Circuit's disability discrimination jurisprudence.

It is true that "[i]n the Title VII context, courts are to be 'particularly cautious' about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested."  *Widomski v. State Univ. of N.Y. at Orange*, 933 F. Supp. 2d 534, 540 (S.D.N.Y. 2013) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) ("[A]n extra measure of caution is merited in . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions.") (internal quotation marks omitted)).  "Nevertheless, '[i]t is . . . beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"  *Widomski*, 933 F. Supp. 2d at 540 (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).  "Thus, while district courts must

pay careful attention to affidavits and depositions which may reveal circumstantial proof of discrimination," *id.* (citing *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994)), courts are not to "treat discrimination differently from other ultimate questions of fact." *Id.* (quoting *Abdu-Brisson*, 239 F.3d at 466).

As mentioned, the sole remaining count of Plaintiff's Complaint is a claim for "unlawful disability discrimination pursuant to the American With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq,*" [ECF No. 1 at 1, 18-19 (Count Three)], in that Plaintiff claims Defendant terminated his employment because of his disability.  [ECF No. 1 at 18-19 (Count Three)].

"In the absence of direct evidence of discrimination, a discriminatory discharge claim brought under the ADA is subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)."  *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 140 (E.D.N.Y. 2015).  "Under this framework, a plaintiff must first set forth a *prima facie* case of discrimination in violation of the ADA by showing the following elements: '(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'"  *Id.* (quoting *McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013));

20

*see also Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251–52 (2d Cir. 2014) (same).

"If the plaintiff establishes a *prima facie* case of unlawful discrimination, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to set forth 'some legitimate, nondiscriminatory reason' for the adverse employment action." *Anderson*, 93 F. Supp. 3d at 140 (quoting *McDonnell Douglas*, 411 U.S. at 802). "Where the defendant articulates such a reason, then the presumption of discrimination is rebutted, and it 'simply drops out of the picture.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993)). "If the employer cites a proper explanation, the plaintiff must show pretext." *Percoco v. Lowe's Home Ctrs.*, 208 F. Supp. 3d 437, 444 (D. Conn. 2016) (citing *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010)). "Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Id.* (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)). "The ultimate question on summary judgment is whether 'the employee's admissible evidence [ ] show[s] circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)).

A.      **Plaintiff has Not Made Out a *Prima Facie* Case of Disability Discrimination**

Plaintiff's *prima facie* case fails for two reasons; namely, that Plaintiff has not established that he was disabled, and Plaintiff does not even argue or present any evidence in making his *prima facie* case that he was terminated due to his disability.

1.      ***Plaintiff is Not Disabled Within the Meaning of the ADA***

"The term 'disability' means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment."

42 U.S.C. § 12102(1).  Plaintiff expressly disclaims that he is pursuing a "regarded as" disability discrimination claim, [ECF No. 39 at 8 n.1 ("Plaintiff has not asserted a perceived disability claim")], and concedes that he has no "record of" of any disabling condition, *id.* at 12 (arguing that he need not provide medical record evidence of his condition) (citing 29 C.F.R. § 1630.2(i)(2)(v)), which leaves Plaintiff to the first prong, *i.e.*, whether he has "a physical or mental impairment that substantially limits one or more major life activities."   42 U.S.C. § 12102(1)(A).  Under the first prong, "plaintiff must first show that [he] suffers from a physical or mental impairment[, s]econd, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity[,' and

22

t]hird, the plaintiff must show that her impairment 'substantially limits' the major life activity previously identified."  *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002).

Concerning whether an impairment "substantially limits" a major life activity, courts should consider whether it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."   29 C.F.R. § 1630.2(j)(1)(ii).   "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  *Id*.  The ADA advises that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."   42 U.S.C. § 12102(4)(A); *see also* 29 C.F.R. § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.  'Substantially limits' is not meant to be a demanding standard.").

Here, Plaintiff alleges that he has met the ADA definition of disability because "he has submitted evidence that shows he suffers from, *inter alia*, ADD/ADHD," [ECF No. 39 at 10], which, Plaintiff states, "is a recognized disability under the ADA."  *Id.* at 10-11 (citing cases).  Plaintiff appears to be arguing here that ADD/ADHD is, more appropriately, an "impairment" for ADA purposes.  Next, he argues that "Plaintiff has identified the following major life activities impaired

by his condition: learning, reading, concentrating, thinking, communicating and interacting with others," *id.* at 11 (citing Affidavit of Marc D. Birnbach, Exhibit 1, [ECF No. 39-3 ("Birnbach Aff.") ¶¶ 5-8]), which, Plaintiff points out, "are 'major life activities' for purposes of the ADA."  *Id.* at 11 n.2 (quoting 29 CFR 1630.2(i)(1)(i)). "Finally, Plaintiff has presented evidence that his impairment substantially limits these major life activities by, inter alia, affecting the pace at which he processes information, takes in information correctly, makes sense of it and responds; rendering him unable to process information like other persons; and causing significant communication issues with others."  *Id.* at 11 (citing Birnbach Aff. ¶¶ 5-8).  The Affidavit sections Plaintiff cites state as follows:

> 5.    I suffer from a combination of dyslexia, slow lag, auditory processing disorder, and attention deficit disorder and attention deficit hyperactivity disorder ('ADD/ADHD').
> 6.    My disability limits the pace at which I process information, including taking In Information correctly, making sense of it and responding.
> 7.  I am unable to process information like other persons.
> 8.  My particular deficit results in significant communication issues with others and generally leads to misunderstandings and/or miscommunications.

[ECF No. 39-3].

At his deposition, when questioned about his impairment, Plaintiff stated that it consisted of "ADHD.  There's, I think, some form of dyslexia.  There's another version of ADAD or something with more initials that I don't remember. Learning lag is in there.  I think that's pretty much it."  Pl.'s Ex. 2 at 58:20-25. Plaintiff also testified that despite seeing psychologists "from childhood all the

way probably to the end of high school," he had never been treated with medication for his impairment.  Def.'s Ex. A at 60:3-15.  When asked about how this impairment affected him "in the context of [his] employment with Americares," Plaintiff stated that "[i]t's affected me mainly in the positives.  It's given me, you know, awareness of who I am and how to be a – able to communicate clearly and work with people who don't necessarily know how to support somebody with this type of need."  *Id.* 60:23-61:5.  Later, Plaintiff was asked: "What impact did your learning disability have on your ability to do your job at Americares?"; Plaintiff responded:

> If you're asking my thoughts, I thought it was minimal.  I thought that just proven with the metrics as far as measurables of what I created, when I created, how I created, where I delivered, it showed productivity in multimedia content creation that had never happened at Americares in the history of Americares.  The amount of content I created for them far surpassed five years of the previous person in my position in what I did in just one year.
> So my disabilities did not weigh in on the productivity of my job.  If anything, it – I felt like it strengthened me to learn more how to operate and work with people and my team in that capacity.

*Id.* 152:5-20.  When asked "[d]o you believe, as you sit here today, that your learning disability substantially limited your ability to work at Americares?," Plaintiff stated: "No."  *Id.* 186:13-16.

Defendant argues that "even assuming, *arguendo*, that Plaintiff has a learning disability as alleged, . . . his deposition testimony undermines any claim that his learning disability 'substantially limits' a major life activity, including working."  [ECF No. 36-1 at 16].  The Court agrees.

25

Plaintiff takes Defendant to task for arguing that Plaintiff should have provided record medical evidence substantiating his claim to a learning disability, [ECF No. 39 at 11-14], and the Court agrees with Plaintiff that such evidence is not always required, as is clear from the text of the statute, which states that Plaintiff can show disability by either establishing "a physical or mental impairment that substantially limits one or more major life activities of such individual" or providing "a record of such an impairment."  42 U.S.C. § 12102(1)(A)-(B).  But here, where Plaintiff's evidence consists of the Complaint's allegations, an affidavit that mirrors the allegations in the Complaint, deposition testimony that only weakly supports these allegations and then completely and in an uncontroverted manner contradicts Plaintiff's claim to substantial impairment, the Court can only conclude that with regard to his work at Americares, Plaintiff was not disabled.

Plaintiff's deposition testimony makes this quite clear: he avers that his impairment caused him to have "productivity in multimedia content creation that had never happened at Americares in the history of Americares.  The amount of content I created for them far surpassed five years of the previous person in my position in what I did in just one year. . . . So my disabilities did not weigh in on the productivity of my job.  If anything, it – I felt like it strengthened me."  Def.'s Ex. A at 152:5-19.  In effect, to use the current vernacular, Plaintiff stated under oath that his impairment gave him a "superpower" that allowed him to

26

outperform all other multimedia creators in the history of Americares.  That is not a disability.

Courts in this Circuit, when faced with a Plaintiff's conclusory allegations and contradictory sworn testimony, have not hesitated to find for Defendant on summary judgment.  *Jeffreys v. City of N.Y.,* 426 F.3d 549, 554-55 (2d Cir. 2005) (affirming grant of summary judgment dismissing excessive force suit brought under 42 U.S.C. § 1983 where the plaintiff relied exclusively on his own testimony, which was "replete with inconsistencies and improbabilities") (internal quotation marks omitted); *see also Shabazz v. Pico,* 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (Sotomayor, J.) ("[W]hen the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations, dispose of some improbable allegations, and dismiss the claim.") (quoting *Denton v. Hernandez*, 504 U.S. 25, 32, 33 (1992)) (internal quotation marks omitted; alterations incorporated).[5]  In any case, Plaintiff was required to show that he not only was impaired but that the impairment shown substantially limited a major life activity.  *See DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 174-75 (D. Conn. 2015) ("A medical diagnosis alone does not necessarily demonstrate that a plaintiff had an impairment under the ADA.  Rather, the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the

---

[5] These two cases are cited by *Fincher*, 604 F.3d at 726-27.

limitation caused by their impairment in terms of their own experience is substantial.") (citations and internal quotations omitted); *Everitt v. Jarvis Airfoil, Inc.*, No. 3:19-cv-001853 (VLB), 2020 WL 7230858, at *5 (D. Conn. Dec. 8, 2020) ("Plaintiff's amended complaint does not allege any facts tending to show that his carpal tunnel syndrome limits in any way his ability to perform tasks constituting a 'major life activity,' much less 'substantially limits' that function, compared to the general population.").

In sum, Plaintiff has failed to show at the *prima facie* stage that he was disabled as defined by the ADA.  The Court grants summary judgment to Defendant on this basis.

> **2.** *Plaintiff Does Not Establish that He was Terminated Due to His Disability*

Defendant flatly asserts that Plaintiff fails "to establish his *prima facie* case of discrimination arising from an adverse employment action under the ADA" because, *inter alia*, "there is no competent and/or admissible evidence to support Plaintiff's claim that he was terminated because of his disability," which means Plaintiff has failed to establish the fourth prong of the *prima facie* test for disability discrimination.  [ECF No. 36-1 at 12-13 (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (fourth prong requires Plaintiff establish "that he suffered an adverse employment action because of his disability.")].

Later, Defendant argues that "[a]s previously noted herein, the final element of Plaintiff's *prima facie* claim of discrimination arising from an adverse

employment action under the ADA is '. . . that he suffered an adverse employment action because of his disability.'"   *Id.* at 22 (citing *Brady*, 531 F.3d at 134).   But, Defendant argues, "[w]hile Plaintiff proffers the conclusory allegation in his Complaint (ECF No. 1 at paragraph 87) that he was terminated because of his disability, same is not supported by any competent and/or admissible evidence." *Id.* at 23.

Plaintiff, in response, asserts that "Defendant does not dispute that Plaintiff has met his burden to establish the . . . fourth prong[] of a *prima facie* case of discrimination under *McDonnell Douglas*."   [ECF No. 39 at 17].

It is beyond the Court to understand how Plaintiff could have missed Defendant's two flat assertions in its Motion for Summary Judgment that there was no "competent and/or admissible evidence to support Plaintiff's claim that he was terminated because of his disability."   [ECF No. 36-1 at 12-13, 22-23].   To be sure, Defendant did not elaborate on where in the record such evidence was lacking, but Defendant is not required to prove a negative.   But when Defendant made this argument and put prong four of Plaintiff's *prima facie* case at issue, it was Plaintiff's charge to meet his burden by arguing what evidence in the record supported his claim that he was terminated due to his disability.   This Plaintiff did not do.   For that reason, the Court grants summary judgment to Defendant.

In sum, Plaintiff has failed to establish two key parts of his *prima facie* disability discrimination case; namely, that he was disabled under the meaning of

the ADA, and that he was terminated due to his disability.  The Court therefore grants Defendant's Motion for Summary Judgment.

      **B.**    **Defendant's Legitimate, Non-Discriminatory Reason for Terminating Plaintiff**

      Even if Plaintiff had made the requisite *prima facie* showing of disability discrimination under *McDonnel Douglas*, Defendant argues that it terminated Plaintiff's employment because of "Plaintiff's making of material misrepresentations regarding his work for Americares and the leveraging [of] same through threats to Defendant's corporate partner, UPS, in an effort to resolve an issue that originated as a private consumer dispute and which was ultimately escalated by UPS to Defendant's management team in an effort to resolve what was perceived by UPS to be, based upon said misrepresentations, a delivery issue affecting an emergency response."  [ECF No. 36-1 at 23].  Thus, Defendant argues, "Plaintiff's employment was terminated for a legitimate, non-discriminatory reason." *Id.*

      Plaintiff's opposition to the Motion for Summary Judgment concedes that "the UPS incident" was "evidence of a legitimate non-discriminatory reason for Plaintiff's termination."  [ECF No. 39 at 17 ("Defendant has presented evidence of a legitimate nondiscriminatory reason for Plaintiff's termination (the UPS incident."))].

      Therefore, the Court finds that Defendant has met its burden of proffering a legitimate, non-discriminatory purpose for Plaintiff's termination, as Plaintiff

concedes.  As a result, any presumption of disability discrimination, even if it had been established, drops out of the case.  *Anderson*, 93 F. Supp. 3d at 140 ("Where the defendant articulates such a [legitimate, non-discriminatory] reason [for termination], then the presumption of discrimination is rebutted, and it 'simply drops out of the picture.'") (quoting *Hicks*, 509 U.S. at 510-11).

C.    Plaintiff Fails to Show that Defendant's Proffered Reason for Terminating His Employment was Pretext for Discrimination

Given that Plaintiff concedes that Defendant had a legitimate nondiscriminatory reason for Plaintiff's termination, Defendant simply argues that Plaintiff has "failed to produce any evidence that the explanation established by Defendant's evidence was a pretext for intentional discrimination on the basis of Plaintiff's alleged disability."  [ECF No. 36-1 at 30].

Plaintiff disagrees, arguing that "Plaintiff has presented sufficient evidence of pretext to survive summary judgment and allow him to present his case to a jury."  [ECF No. 39 at 17].  This is so, according to Plaintiff, because 1.) his direct supervisor, Jed Selkowitz, made discriminatory comments about him regarding his disability, calling his ideas "wonky" and referring to Plaintiff as a "nut job," 2.) Selkowitz "marginalized" Plaintiff in the workplace, provided him with a negative review "that specifically referenced his 'learning style' and deficiencies in his 'information processing,'" criticized Plaintiff's "performance and communications skills," and did nothing when Plaintiff complained that Selkowitz's actions were related to Plaintiff's disability, and 3.) Selkowitz knew

about Plaintiff's disability and, under a "cat's paw" theory of liability, Selkowitz's "improperly motivated recommendation" to terminate Plaintiff's employment "may be imputed to Mr. Nyenhuis," who made the final decision to terminate Plaintiff, "even if Mr. Selkowitz was not directly involved in the final decision." [ECF No. 39 at 19-21]. This is reinforced, Plaintiff claims, by Defendant's opposition filings with the CHRO in which Defendant referred to Selkowitz, and others, as "primary decision makers with respect to both the hiring and firing of [Plaintiff]," and referred to Selkowitz as "recommending" the termination of Plaintiff. *Id.* at 19-20 (citing [ECF No. 39-10 ¶ 41] and [ECF No. 39-11 ¶ 11(c)]).

Defendant replies that Selkowitz's comments concerning Plaintiff's "wonky" ideas and referring to Plaintiff as a "nut job" were, under Second Circuit precedent, mere "stray comments" that "do not constitute evidence [to support] a case of employment discrimination." [ECF No. 42 at 10 (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir 1998))]. This is especially so, according to Defendant, because "Plaintiff admitted . . . that he never actually heard anyone say anything derogatory about him or his learning disability," Plaintiff himself actually described one of his own ideas as "wonky" in an email to Selkowitz, and there is no evidence of a temporal nexus between Selkowitz's statements and Plaintiff's termination. *Id.* at 10-13.

As to Selkowitz's "marginalization" of Plaintiff and comments and refusal to respond to Plaintiff's complaints about his disability, Defendant argues that

Selkowitz actually praised Plaintiff on numerous occasions and in the review in question, never referred to any of Plaintiff's attributes as deficiencies, and did not criticize Plaintiff's "communications skills." [ECF No. 42 at 16]. Therefore, according to Defendant, there is no support for a "cat's paw" theory of disability discrimination liability, especially since Selkowitz "expressly denied understanding, knowing, and/or perceiving that Plaintiff has/had a disability," had no input on Plaintiff's termination, and did not recommend it to the ultimate decision-maker. *Id.* at 16-19. As to the CHRO filings in which Defendant described Selkowitz as a primary decision maker or as recommending Plaintiff's termination, Defendant states that those responses (i) were "limited . . . to Plaintiff's claims of sex discrimination" which are "not asserted in this matter," (ii) were denied in Defendant's Answer, (iii) were "premised upon the recollection of Mr. Gilrain at the time of the CHRO proceedings," (iv) were not signed by nor sworn to by Selkowitz, and (v) could not be amended or otherwise corrected because the "CHRO dismissed Plaintiff's Charge of Discrimination." [ECF No. 42 at 19-20].

Plaintiff, with leave of Court, filed a Sur-reply, [ECF No. 48], in which he argues that Selkowitz's comments about Plaintiff were not "stray remarks," and that Defendant mis-cites *Danzer*, whose central holding, according to Plaintiff, was that "[w]hen, however . . . other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray' and the jury has the right

to conclude that they bear a more ominous significance."   [ECF No. 48 at 1-3 (citing *Danzer*, 151 F.3d at 56)].   Plaintiff also argues that other cases cited by Defendant in support of its "stray remarks" argument are distinguishable, because the facts involved are so different that "the rationale of [the case does] not apply to this case," *id.* at 3-4 (citing *Hasemann v. United Parcel Servs. Of Am., Inc.*, No. 3:11-cv-00554 (VLB), 2013 WL 696424 (D. Conn. Feb. 26, 2013)), or because the cited cases contain no analysis of the stray remarks doctrine.   *Id.* at 4 (citing cases).

As to Defendant's arguments concerning why the CHRO filings do not show that Selkowitz was involved in Plaintiff's termination, Plaintiff argues that on summary judgment "the Court may not simply disregard these admissions and choose to give them no weight," citing *Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) for the proposition that "[t]he weighing of the evidence and the determination as to which version of the events to accept are matters for the jury."  Therefore, Plaintiff argues:

> Birnbach has presented evidence, in the form of Defendant's sworn admissions to the CHRO, that Selkowitz was involved in the termination decision.   Defendant has presented contrary evidence and arguments as to why these admissions should be disregarded. The Court cannot choose between the two.  Rather, it is required to draw all reasonable inferences in favor of Birnbach and conclude that Defendant's sworn admissions are sufficient to permit the question to go to a jury.

[ECF No. 48 at 6].

The Court holds that even if Plaintiff made the requisite *prima facie* showing under *McDonnell Douglas*, no rational jury could find, under a "cat's paw" theory, that Defendant's legitimate, non-discriminatory termination of Plaintiff's employment was mere pretext for improperly firing Plaintiff because of his disability.

The "cat's paw" theory of discrimination involves "a non-decisionmaker with a discriminatory motive [who] dupes an innocent decisionmaker into taking action against the plaintiff." *Hart v. Estuary Council of Seniors, Inc.*, No. 3:14-cv-00614 (VLB), 2016 WL 755603, at *8 n.3 (D. Conn. Feb. 25, 2015) (quoting *Saviano v. Town of Westport*, No. 3:04-cv-00522 (RNC), 2011 WL 4561184, at *7 (D. Conn. Sept. 30, 2011)).  "A 'central principle' behind 'cat's paw liability' is the delegation of decision-making or fact-finding power to a biased supervisor, who then influences the decision-maker."  *Id.* (quoting *Rajaravivarma v. Bd. of Trustees for Conn. State Univ. Sys.*, 862 F. Supp. 2d 127, 152 (D. Conn. 2012)); *see also Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) ("[T]he 'cat's paw' metaphor now 'refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.'") (quoting *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (Posner, J.)).  "In other words, by merely effectuating or 'rubber-

stamp[ing]' a discriminatory employee's 'unlawful design,' the employer . . . [opens] itself to . . . [be] successfully sued." *Id.* (quoting *Nagle v. Marron*, 663 F.3d 100, 117 (2d Cir. 2011)).

In sum, an employer may be liable under a "cat's paw" theory "for the animus of a supervisor who was not charged with the ultimate employment decision . . . if [the] supervisor performs an act motivated by [improper] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Rajaravivarma*, 862 F. Supp. 2d at 149 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422-23 (2011)).

There are several problems with Plaintiff's "cat's paw" theory.  First, there is almost no evidence that Jed Selkowitz harbored an improper discriminatory bias based on Plaintiff's alleged impairment.  As to Selkowitz calling Plaintiff's ideas "wonky," the Court has trouble ascribing this comment to Selkowitz's alleged discriminatory bias when Plaintiff himself used the same term to describe his own ideas.  On August 29, 2018, Plaintiff sent Selkowitz an email entitled "Wonky idea #1" in which Plaintiff enclosed a picture of a candy bar wrapper and suggested that the candy company's ties to El Salvador and distribution in Whole Foods and Trader Joes might provide a productive avenue for Americares to pursue in the future.  [ECF No. 42-14].  Selkowitz replied "Interesting.  Can you send me higher res image?  I can't blow these up to read." *Id.*  As to the term

"nut job," Plaintiff testified that Selkowitz never referenced his impairment in any team meetings, Plaintiff never "hear[d] anyone say anything derogatory about [him] or his learning disability," and noted that Selkowitz's use of the term "nut job" was done in conjunction with Selkowitz using the phrase "[t]his is why, you know, we love you."   Pl.'s Ex. 2 at 104:17-20, 105:2-19.   Whether the Court characterizes these comments as "stray remarks" or not, *see Tomassi v. Insignia Financial Group, Inc*, 478 F.3d 111, 115 (2d Cir. 2007) (calling the "stray remarks" doctrine "perhaps [an] oversimplified generalization"), neither of these comments had anything to do with Plaintiff's impairment, nor has Plaintiff presented any evidence that they have any temporal or other nexus with the decision to terminate Plaintiff's employment.

Moreover, the evidence shows that Selkowitz, to the extent he even considered Plaintiff's impairment, considered it a net positive, as did Plaintiff:

Q.     Well, was [Plaintiff] a good employee?
A.     Yes, Marc at times was a good employee. . . . Marc brought a different level – one of the reasons I was excited about Marc joining the organization was because Marc brought sort of a different level of creativity, outside the box thinking.
. . .
Q.     Now, at any time did you ever have any discussions with Marc about his learning disability?
A.     No.  The word – not to my recollection using the word disability, no.
Q.     Well, what discussions did you have with Marc on the subject?
A.     Again, I wouldn't characterize the discussion as discussions about the subject disability.
Q.     Okay.  What would you characterize the discussions as?
A.     Well, to be frank, outside of this process, I wouldn't – if somebody had asked me that question, I wouldn't really know how to answer because my discussions with various members of my team revolve

around different strengths and opportunities that they may have.  So, again, I wouldn't refer to anything related to what we're discussing as a disability because it was never discussed as such.  That said, as I know what we're talking about there, you know, throughout Marc's time, occasional times Marc would speak to me about the potential of processing things differently, the need to write things down in detail, you know, just things like that.

. . .

Q.    Mr. Selkowitz, separate and apart from anything you may have learned in the course of this litigation matter, did you ever understand or know Marc Birnbach to have a disability during the time that you worked with him?

A.    No, never.

Q.    Did you ever perceive Marc to have a disability during any time that you worked with him?

A.    No, never.

[ECF No. 36-7 Transcript of Jed Selkowitz Deposition dated July 24, 2020 ("Def.'s Ex. J") at 14:3-15:24, 118:7-15].  These comments were echoed in Selkowitz's remarks about Plaintiff in Plaintiff's Annual Review in a section where Plaintiff noted that he was "slow to process information clearly."  Selkowitz wrote: "Marc's unique perspective and approach to projects was a key reason I was excited he was joining our team.  We do not see it as a negative and I think the team has done well to embrace a nonlinear content creator who has outside the box ideas."  [ECF No. 39-6 at 11].

Moreover, the Court notes that while "regarded as" disability discrimination was a key part of Plaintiff's Complaint, [ECF No. 1 ¶ 90 ("Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment substantially because . . . he was regarded as disabled pursuant to the ADA.")], Plaintiff has now expressly disclaimed this theory of liability.  In

other words, Plaintiff no longer wishes to pursue relief on the grounds that his employer "regarded" him as disabled.  But if Jed Selkowitz did not regard Plaintiff as disabled, which appears to be the case, he could not and would not have intentionally and improperly influenced the ultimate decision-maker, Americares CEO Michael Nyenhuis, to fire Plaintiff because of his disability, rendering Plaintiff's "cat's paw" theory of liability nugatory.

As to Defendant's CHRO responses, which characterized Selkowitz as either one of the "primary decision makers with respect to both the hiring and firing of [Plaintiff]," [ECF No. 39-10 ¶ 41], or referred to Selkowitz as "recommending" the termination of Plaintiff, [ECF No. 39-11 ¶ 11(c)], the Court notes that if Selkowitz was a "primary decision maker" in Plaintiff's termination, that would make the cat's paw theory untenable, as it requires the decision-maker be influenced by the improper animus of a subordinate, and to the extent Selkowitz actually did recommend Plaintiff's termination, which the record is ambivalent about and which the Court does not decide, Plaintiff gave Selkowitz plenty of reason to recommend his termination.

As mentioned,

- Plaintiff "did not seem to have full command of the technology" he used, indicating that "sometimes he d[id] not invest enough in the book learning of his craft,"

- Plaintiff "was not effectively managing Jake [Rauscher] after repeated coaching attempts.  Despite some effort by Marc to improve his management of Jake, I observed a continuing erosion of the relationship and Jake became a flight risk.  Marc made efforts to establish a routine with Jake, [but t]hese routines did not last and (by personal observation

39

and feedback delivered to me), Marc's feedback came off more as criticism of Jake's work,"

- Plaintiff "procrastinated on . . . [some] assignment[s]," failed to "t[ake] the lead and present[] recommendations" on some projects, and "[needed] flexibility in . . . us[ing] the same video editing platform [as Jake Rauscher],"

- Plaintiff "took a first-class seat on [a] charter, leaving [an Americares] donor assigned to that seat to go back to economy.  It was a very embarrassing situation . . . While Marc acknowledged it was inappropriate when it was pointed put to him, he clearly didn't recognize it at the time,"

- Plaintiff "took [a] computer he had purchased to a freelance gig [but] a memory card of Jake's had been downloaded onto that computer by mistake.  Without confirming we had a backup of that card, Marc deleted it from the computer.  We lost an entire card of Jake's content.  While others were also to blame for this, Marc took little to no responsibility at the time and sought to put blame on teammates during our discussion,"

- Plaintiff did not "partner with [Ted and Sam Kelly] to better understand the performance of [Americares'] video content," despite Selkowitz's request, and

- Plaintiff "was supposed to be a leader among the photographers, but he showed up 30 minutes late . . . missing the pre-event brief . . . [because of a personal] freelance gig."

[ECF No. 39-6].  These are only the "highlights" of Plaintiff's 2018 Annual Review, which are discussed in more detail, *supra.*  In addition, Plaintiff moved to Wisconsin when AmeriCares did not have a work-from-home policy without informing Selkowitz, his direct supervisor, who heard it first from co-workers who thought Plaintiff had left the company, [ECF No. 42-7], and Plaintiff misled Selkowitz about the "seamless integrat[ion of visual effects]," stating that despite working remotely this would be "highly adaptable and easy," *id.*, yet less than two months later Selkowitz expressed "confus[ion]" about Plaintiff having to mail

a disc drive to Jake Rauscher to share video files.  [ECF No. 42-8].  And when Selkowitz asked Plaintiff about this, Plaintiff blamed Selkowitz and Plaintiff's impairment, despite Selkowitz making no mention of it in his email.  [ECF No. 39-8 ("still I have to defend that I don't process information well")].  And not only was Plaintiff a poor manager of his only direct report, Jake Rauscher, causing Selkowitz to reassign Rauscher to another manager, Plaintiff admitted at his deposition that his "relationship [with Rauscher] was very minimal," which must have left Selkowitz feeling that he made the correct choice in reassigning Rauscher.  Pl.'s Ex. 2 at 104:10-11.

Plaintiff's response to "the UPS event" was equally tone deaf and likely the straw that broke the camel's back, to the extent Selkowitz was considering recommending Plaintiff's termination.  When questioned about it by Selkowitz, Plaintiff responded "[t]here was no support of flexibility [on UPS's part] due to ups [sic] policy[, . . . ] I positioned solutions which were rejected [by UPS, . . .] this stopped my work for americares [sic] today and escalated frustrations [and] I left a generic direct review on facebook about my frustrations [with UPS] with no mention of americares."  [ECF No. 42-10].  Here, Plaintiff again misled Selkowitz, claiming that UPS stopped [his] work for [A]mericares today," when in fact he was on vacation and working on personal business.  Similarly, Plaintiff blamed UPS in his email to Diana Maguire: "***UPS did two major disservices to me*** and this should never have gone in the direction it did and ***what a mess [UPS]***

41

*created*." [ECF No. 42-9 (emphasis added)].  In sum, there is little evidence that Jed Selkowitz even considered Plaintiff disabled, and to the extent he did influence Americares' CEO in firing Plaintiff, he had good reason to for reasons having nothing to do with Plaintiff's alleged impairment.

Plaintiff has failed to make out a *prima facie* case for disability discrimination.  But even if Plaintiff *could* establish a *prima facie* case of disability discrimination, Defendant has put forth, as outlined above, a legitimate, nondiscriminatory reason for terminating Plaintiff, namely, his inappropriate behavior toward UPS in handling a private matter that could easily have jeopardized Americares' prized relationship with its key partner, UPS.  And Plaintiff has failed to establish or present evidence of a genuine issue of material fact regarding Defendant's termination of his employment being mere pretext for disability discrimination.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment.  [ECF No. 36].  The Clerk is instructed to close this case and enter Judgment in Defendant's favor.

Vanessa Bryant  Digitally signed by Vanessa Bryant
Date: 2021.09.18 14:35:16 -04'00'

**Vanessa L. Bryant**
**United States District Judge**


**SO ORDERED at Hartford, Connecticut.**